UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

SPENCER NEAL,

    Plaintiff,

    v.

DIVYA JYOTI LTD.,

    Defendant.

Case No. 2:18-cv-958
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Kimberly A. Jolson

## OPINION AND ORDER

This matter is before the Court on Plaintiff Spencer Neal's Motion for Summary Judgment (ECF No. 18) and subsequent Memorandum in Support of Summary Judgment (ECF No. 19). Defendant responded (ECF No. 26) and Plaintiff replied (ECF No. 28). Accordingly, this matter is ripe for disposition. For the reasons stated herein, Plaintiff's Motion for Summary Judgment (ECF No. 18) is **GRANTED in part and DENIED in part**.

### I.

Plaintiff Spencer Neal ("Neal" or "Plaintiff") filed suit against Defendant Divya Jyoti, Ltd. ("Divya" or "Defendant") after allegedly encountering numerous architectural barriers at a Quality Inn and Suites owned by Defendant, under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181–12189. (*See generally* Compl. [ECF No. 1]). The Complaint requests declaratory judgment, injunctive relief, and attorneys' fees. (*Id.* ¶¶ A–D).

Plaintiff submits that he is handicapped and confined to a wheelchair; and thus, is disabled. (Neal Aff. 1 ¶ 1 [ECF No. 19-1]). Further, Plaintiff is an ADA "tester," meaning he travels to the Columbus, Ohio area to visit public facilities and checks for ADA compliance. (*See id.* ¶ 2). And

when Plaintiff finds compliance lacking, he sues.[1]

## A.  Plaintiff's Visit to the Quality Inn

On August 6, 2018, Plaintiff visited the Quality Inn and Suites ("Quality Inn"), located at 3590 Tuller Road, Dublin, Ohio. (Neal Aff. 1 ¶ 3; Neal Aff. 2 ¶ 1 [ECF No. 28-1]; Kumari Aff. ¶¶ 5–6 [ECF No. 26-1, Ex. A]). While there, he claims he suffered discrimination caused by architectural barriers in the parking lot and inside the hotel. (Neal Aff. 1 ¶ 4; *see also* Neal Aff. 2 ¶¶ 2–3). The alleged violations are documented in the Complaint, two affidavits submitted by Plaintiff, and an expert report authored by Derek Mortland. Plaintiff filed the case at bar to remedy these alleged ADA violations.

Plaintiff lives in Akron, Ohio, which is approximately 123 miles from the Quality Inn.[2] (Neal Aff. 1 ¶ 2). Plaintiff visits the central-Ohio area frequently, as he has friends that reside near or in Columbus, Ohio. (*Id.*). Plaintiff submits that he desires to return to the Quality Inn. (*Id.* ¶ 5). Plaintiff contends that during his stay at the Quality Inn he observed and/or encountered:

> (1) exterior barriers, which include barriers to the parking lot and entry way, (2) interior barriers, which include barriers in the hotel's lobby, breakfast area, and public restroom, (3) and barriers in the accessible guest room, which include barriers with the room's toilet and lavatory area.

(*Id.* ¶ 4). He claims that, when he arrived at the Quality Inn, he approached the reservation desk in the hotel lobby and asked for a handicapped accessible room and received a key for room 206.

---

[1] In addition to the case at bar, Plaintiff is a party in at least eight other cases in this Court; in all of these cases, Plaintiff has alleged violations of the ADA. *See Neal v. Morales Real Estate Invs.*, No. 2:18-cv-632; *Neal v. O'Manny's Pub Inc.*, No. 2:18-cv-980; *Neal v. DSW Inns, LLC*, No. 2:18-cv-997; *Neal v. Campus Hotel, LLC*, No. 2:18-cv-1560; *Neal v. The J. Fred Schmidt Packing Co.*, No. 2:18-cv-1589; *Neal v. The Pilsner Boys, LLC, et al.*, No. 2:19-cv-829; *Neal v. Kalamata LLC, et al.*, No. 2:19-cv-1645; *Neal v. Terra Hosp.—OSU I, LLC*, No. 2:19-cv-2850.

[2] The Court notes that neither party supplied the Court with the distance between Akron, Ohio and Dublin, Ohio. However, the Court takes judicial notice of the approximate distance between the two cities. *See* Google Maps, http://www.google.com/maps (last visited July 25, 2019) (calculating a distance of 123 miles).

(Neal Aff. 2 ¶¶ 1–2). Plaintiff submits that he did not make a reservation at the Quality Inn prior to his arrival at the hotel. (*Id.* ¶ 1). Plaintiff states that, even though the room he received was not an accessible room, he "stayed in room 206 for as long as practical." (*Id.* ¶ 4). However, he "was unable to take a shower due to the inaccessible bathroom," and left the Quality Inn sometime in the morning and found another hotel. (*Id.*). Plaintiff submits that he did return to the Quality Inn later that same day to request a refund, which was given to him. (*Id.* ¶ 5).

Defendant's detailing of Plaintiff's visit to the Quality Inn differs. Defendant avers that before he arrived at the Quality Inn, Plaintiff made an online reservation for a regular room with a king-sized bed, rather than a handicap accessible room. (Kumari Aff. ¶ 5 [ECF No. 26-1, Ex. A]). However, when Plaintiff arrived at the Quality Inn, he asked for a handicap accessible room, and Savita Kumari ("Ms. Kumari"), who was working the hotel's front desk when Plaintiff arrived, informed Plaintiff that a handicap accessible room was not available at that time. (Kumari Aff. ¶ 6). And after learning that the hotel did not have a handicap accessible room available, Plaintiff departed immediately and did not stay overnight at the hotel. (*Id.*). Plaintiff, however, returned to the Quality Inn the following morning at approximately 7:04 a.m. and asked for a refund, which Ms. Kumari supplied. (Kumari Aff. ¶ 7–8). After receiving the refund, Defendant avers that Plaintiff left the hotel right away. (*Id.* ¶ 8). Accordingly, Defendant submits: "there is no way [Plaintiff] could have observed the alleged interior barriers, barriers in the guest room, barriers in the room's toilet and lavatory area[, as] [h]e never visited or looked at any such area." (*Id.*).

## B. Derek Mortland's Barrier Identification Survey

On December 14, 2018, Plaintiff's expert, Derek Mortland ("Mortland"), conducted an ADA barrier identification site survey. And on December 19, 2018, Mortland identified eighty-five barriers to accessibility in a report. (*See generally* Mortland Report [ECF No. 19-6]). Plaintiff

then requested that Defendant make the following eighty-five (85) recommendations:

| Alleged Violation | Proposed Remedy | Estimated Cost of Repair |
|---|---|---|
| 1. **Parking**: The demarcated handicap accessible parking in the hotel's **westside** parking lot is not on an accessible route from the parking lot to the hotel building as a parked vehicle can block the curb ramp from the parking lot to the sidewalk | Move parking space over to one space to the left and provide an eight-foot marked aisle on right side of space that connects to curb ramp | $1,500 |
| 2. **Parking**: There is no access aisle that abuts the demarcated handicap accessible parking located in the hotel's westside parking lot | Move parking space over to one space to the left and provide an eight-foot marked aisle on right side of space that connects to curb ramp | $1,500 |
| 3. **Parking**: The parking lot on the hotel's westside does not have van accessible parking | Move parking space over to one space to the left and provide an eight-foot marked aisle on right side of space that connects to curb ramp | $150 |
| 4. **Parking**: The sign designating the parking space in the hotel's westside parking lot as handicap accessible parking is 36-inches above the ground | Mount sign at least 60-inches above the ground from the bottom of the sign | $150 |
| 5. **Parking**: The sign designating the parking space as handicap accessible parking is missing the "van accessible" sign | Include a "Van Accessible" sign under the handicap parking placard | $25 |
| 6. **Parking**: The demarcated handicap accessible parking space in the hotel's eastside parking lot is not located on a handicap accessible route as a parked vehicle can block the curb ramp from the parking lot to the sidewalk | Move parking space one space to the right, provide a five-foot demarcated access aisle on the left side of the space that connects to the curb | $0 |
| 7. **Parking**: There is no access aisle abutting the demarcated handicap accessible parking space located in the hotel's eastside parking lot | Move parking space one space to the right, provide a five-foot demarcated access aisle on the left side of the space that connects to the curb | $1,500 |
| 8. **Parking**: The sign designating the handicap accessible parking space in the hotel's eastside parking lot is 36-inches above the ground | Mount sign at least 60-inches above the ground from the bottom of the sign | $150 |

4

| | | |
|---|---|---|
| **9. Exterior Accessible Route**: The curb ramp from the westside's parking lot to the sidewalk has a slope of 13.3% | Remove existing curb ramp; regrade the area; and provide a new ramp with a maximum grade of 8.33% | $2,500 |
| **10. Exterior Accessible Route**: The side flares on the curb ramp from the westside's parking lot to the sidewalk have grades between 27.4% and 38.7%. | When replacing the ramp as described in Violation #9, the side flare slopes should be constructed to have a maximum grade of 10% | $2,500 |
| **11. Exterior Accessible Route**: The gutter of the hotel's westside parking lot's curb ramp level change exceeds ¼-inches | When removing the ramp as described in Violation #9, the gutter transition must be level with the asphalt within ¼ inches | $1,500 |
| **12. Exterior Accessible Route**: There is a change in level that exceeds ¼-inches along the sidewalk that abuts the parking lot on the hotel's westside | Provide a sidewalk that has smooth and level transitions, the transitions at the sidewalk's joints should not exceed ¼-inches or ½-inches if the joints are beveled | $1,500 |
| **13. Exterior Accessible Route**: The sidewalk on the hotel's westside narrows to 34.5-inches wide when a vehicle is parked in one of the parking spaces that abut such sidewalk | Expand the sidewalk to at least a width of 48-inches; or install stop blocks at parking space to prevent vehicles from narrowing the sidewalk to less than 36-inches | $2,500 |
| **14. Exterior Accessible Route**: The curb ramp to access the hotel's front entrance from the parking lot has a slope of 11.4% | Remove existing curb ramp and replace with a ramp that has a maximum grade of 8.33% | $2,500 |
| **15. Exterior Accessible Route**: The side flares on the curb ramp from the parking lot to the hotel's front entrances have grades between 35% and 38.8% | When removing and replacing curb ramp described in Violation #14, the side flares of the new ramp should not exceed a grade of 10% | $2,500 |
| **16. Exterior Accessible Route**: The level change between the front entrance's curb ramp and the parking lot is not level within ¼-inches | When removing and replacing curb ramp described in Violation #14, the gutter transition must be level with the asphalt within ¼ inches | $1,500 |
| **17. Exterior Accessible Route**: Building's eastside curb ramp's slope has a grade of 16.6% | Remove existing curb ramp and replace with a ramp that has a maximum grade of 8.3% | $2,500 |
| **18. Exterior Accessible Route**: Building's eastside curb ramp's side flares have grades between 45.2%–46% | When removing an replacing the curb ramp described in violation #17, the side flares' slopes should not exceed a grade of 10% | $2,500 |

| | | |
|---|---|---|
| 19. **Exterior Accessible Route**: Building's eastside curb ramp's transition at the gutter exceeds ¼ inches because of uneven edges between the sidewalk and asphalt | When removing and replacing the curb ramp described in violation #17, the gutter transition must be level with the asphalt within ¼ inches | $1,500 |
| 20. **Entrance**: Doormat at entrance is not secured in place | Completely remove the doormat or secure the doormat to the ground | $150 |
| 21. **Lobby**: there is no handrail on the right side of the stairway | Provide an ADA-compliant handrail to the stairway's right side | $1,500 |
| 22. **Lobby**: stairway's left side handrail does not extend 12-inches from the bottom of the stairway | Provide a 12-inch handrail extension to the bottom of the stairway's left side | $1,500 |
| 23. **Lobby**: the handle to open the fire extinguisher encasement is located 53.5-inches from the ground | Lower the placement of the handle to be no higher than 48-inches from the ground | $150 |
| 24. **Lobby**: Pamphlets at the top of the pamphlet rack are 53-inches above the floor | Lower the pamphlets so that they are no more than 48-inches from the floor | $150 |
| 25. **Lobby**: The computer desk's knee clear is 26.25-inches | Provide a desk that has the following dimensions: at least 27-inches knee clearance; at least 30-inches width; and at least 19-inches deep | $150 |
| 26. **Lobby**: Doormat at the interior entry door is loose and is not secured to the ground | Remove or securely attach the doormat to the ground | $150 |
| 27. **Lobby**: Employee computer obstructs the handicap accessible portion of the front desk | Remove and relocate the computer and monitor; and leave clear from obstructions the accessible portion of the front desk | $1,500 |
| 28. **Lobby**: The pull for the fire alarm is 51-inches from the floor | Lower the fire alarm station to a maximum of 48-inches from the floor | $150 |
| 29. **Breakfast**: Door opening's clearance is 30-inches per door between the door's face and the opposite stop | Remove doors or provide doors that allow for a minimum of 32-inches of clear opening per door | $250 |
| 30. **Breakfast**: Countertops for the breakfast bar measure 36.5-inches from the floor | Provide countertops that are, at most, 36-inches from the ground | $2,500 |
| 31. **Breakfast**: Toaster is located 49-inches above the ground and the depth to reach the toaster exceeds 10-inches | Remove that base that the toaster rests upon and place the toaster directly on a counter top that stands no taller than 46-inches from the ground | $2,500 |
| 32. **Breakfast**: The operable components of the juice dispenser are located 55-inches above ground | Lower the juice dispenser so that the highest operable part is no more than 48-inches from the ground | $2,500 |

| | | |
|---|---|---|
| 33. **Breakfast**: The cups for the waffle batter are 55-inches above the floor | Relocate the cups so that: 1) if the cups are greater than a 10-inch reach depth then the cups be no higher than 46-inches above the floor; or 2) if the cups are at a reach depth of less than 10-inches then the cups should be no higher than 48-inches above the floor | $2,500 |
| 34. **Breakfast**: The breakfast area does not have wheelchair-accessible tables | Provide for 5% of seating (or at least 1 table minimum) to be wheelchair accessible. The accessible table must have at least 27-inches of knee space, be 30-inches wide, and be 19-inches deep | $1,500 |
| 35. **Public Restroom**: The doorknob is not accessible | Remove existing doorknob and replace with accessible lever type doorknob on both sides of door | $25 |
| 36. **Public Restroom**: the supply and drain pipes under the sink are exposed and are not insulted | Cover exposed pipes with insulating wrap | $150 |
| 37. **Public Restroom**: Knee clearance at the sink is 25.5-inches from ground | Provide knee clearance of at least 27-inches from the ground with a depth of 8-inches | $1,500 |
| 38. **Public Restroom**: The rim of the sink is 34.5-inches above the floor | Provide sink rim that is no more than 34-inches above the floor | $1,500 |
| 39. **Public Restroom**: Paper towels are located 52-inches above the floor | Lower the paper towel dispenser so that the paper towels are no more than 48-inches above the floor | $150 |
| 40. **Public Restroom**: The reflect edge of the mirror is located 47-inches above the floor | Lower the mirror so that the reflecting edge is no more than 40-inches from the floor; or install a full-length mirror on the opposite wall that's reflecting edge is no more than 35-inches above the floor | $150 |
| 41. **Public Restroom**: The side-grab bar next to the commode is 42-inches from the ground | Lower the top of the grab bar to be no lower than 33-inches from the floor and no greater than 36-inches from the floor | $150 |
| 42. **Public Restroom**: The side-grab bar next to the commode extends 49.5-inches from the back wall | Remount the side-grab bar so that the bar extends at least 54-inches from the back wall | $150 |
| 43. **Public Restroom**: The toilet paper dispenser is less than 7-inches from the front of the commode's seat | Provide a single roll of toilet paper no less than 7-inches and no greater than 9-inches from the front of the commode's seat; the toilet paper roll should be at least 15-inches above the | $150 |

| | floor and at least 1.5-inches under the side-grab bar | |
|---|---|---|
| 44. **Public Restroom**: The commode's flush handle is located on the commode's wall side | Provide a commode with a flush handle on the non-wall side; when replacing the commode, ensure that the commode's center is no less than 16-inches and no more than 19-inches from the side wall | $150 |
| 45. **Public Restroom**: There is no back grab bar behind the commode | Install a 36-inch rear grab bar that is mounted 6-inches from the side wall and that is no less than 33-inches and no more than 36-inches from the floor | $150 |
| 46. **Public Restroom**: Seat cover dispenser is on the wall behind the commode and is 47-inches from the ground | Remount the seat cover dispenser so that: it is no more than 48-inches from the ground; and remount it in an area where there is a 30-inch wide by 48-inch deep area of clear floor space | $150 |
| 47. **Public Restroom**: The feminine hygiene product dispenser is 52-inches from the floor and access is obstructed by a trash can | Relocate the trash can to an area that it does not obstruct access to other amenities and lower the feminine hygiene product dispenser so that its operable parts are no higher than 48-inches from the floor | $150 |
| 48. **Public Restroom**: Tight grasping and twisting is required to operate the feminine hygiene product dispenser | Provide operable parts on the dispenser that do not require tight grasping, pinching or twisting | $25 |
| 49. **Guest Laundry**: The laundry product vending machine projects 10-inches from the wall and the controls project 14-inches from the wall at heights above 27-inches from the floor | Lower the bottom edge of the vending machine to no more than 27-inches from the floor | $150 |
| 50. **Guest Laundry**: The controls to operate the washing machine and/or dryer doors and /or lint screens, detergent and bleach compartments require tight grasping, pinching, and twisting to operate | Provide controls that do no require tight grasping, pinching, and twisting to operate | $1,500 |
| 51. **Guest Laundry**: The coin slot for the soda vending machine is 52.5-inches from the floor | Provide a vending machine that's operable component is no higher than 48-inches from the floor | $150 |
| 52. **Room 102**: The supply and drain pipes under the in-room sink are exposed and are not insulted | Cover exposed pipes with insulating wrap | $1,500 |

| | | |
|---|---|---|
| 53. **Room 102**: Knee clearance at the sink is 26-inches from the floor | Provide knee clearance of at least 27-inches from the floor with a depth of 8-inches under the sink | $1,500 |
| 54. **Room 102**: The reflect edge of the mirror is 42-inches from the floor | Lower the mirror's reflecting edge to more than 40-inches from the floor | $150 |
| 55. **Room 102**: The rim of the sink is 34.75-inches above the floor | Provide a sink rim that is no more than 34-inches from the floor | $1,500 |
| 56. **Room 102**: The towel bar is 58.5-inches from the floor | Lower the towel bar so that it is no more than 48-inches from the floor | $150 |
| 57. **Room 102**: The side-grab bar next to the commode is 14.5-inches from the rear wall | Move the side-grab bar so that it is 12-inches from the rear wall and that the leading edge of the grab bar is 54-inches from the rear wall | $150 |
| 58. **Room 102**: The top side of the side grab bar next to the commode is 39-inches from the ground | Remount the grab bar so that it is 12-inches from the rear wall and so that the top of the grab bar is no less than 33-inches and no more than 36-inches above the ground | $150 |
| 59. **Room 102**: There is no grab bar behind the commode | Install a 36-inch rear grab bar that is mounted 6-inches from the side wall and that is no less than 33-inches and no more than 36-inches from the floor | $150 |
| 60. **Room 102**: The commode's flush handle is located on the commode's wall side | Provide a commode with a flush handle on the non-wall side | $150 |
| 61. **Room 102**: The center line of the commode is 18.5-inches from the side wall | Ensure that the commode's center is no less than 16-inches and no more than 19-inches from the side wall | $150 |
| 62. **Room 102**: The toilet paper dispenser is less than 7-inches from the front of the commode's seat | Remount the toilet paper dispenser at its current no less than 7-inches and no more than 9-inches away from the front of the commode's seat | $150 |
| 63. **Room 102**: A towel rack is mounted above the commode; is 53-inches from the ground; and is not accessible | Relocate towel rack to an area that has a 30-inch by 48-inch area of clear floor space; the towel rack should be remounted no higher than 48-inches from the floor | $50 |
| 64. **Room 102**: The handheld showerhead is more than 48-inches above the ground | Install a vertical slider bar, attach showerhead to the vertical slider bar, and mount the showerhead no higher than 48-inches from the floor | $150 |
| 65. **Room 102**: The shower's on/off control is not non-positive | Install a hand-held showerhead unit that is equipped with a non-positive on/off control | $25 |

| | | |
|---|---|---|
| 66. **Room 102**: The threshold to enter the shower is 3-inches above the floor | Install a threshold that is level with the floor within ¼ inches or install a threshold that is level with the floor within ½ inches beveled at 1:2 max | $250 |
| 67. **Room 102**: The shower's grab bar is 29-inches above the floor | Remount the shower's grab bar so that the top of the grab bar is at least 33-inches and no more than 36-inches above the floor | $150 |
| 68. **Room 102**: The shower does not have a side grab bar on the control wall | Mount a horizontal grab bar on the shower's control wall. The top of the grab bar must be at least 33-inches and no more than 36-inches from the floor. There are to be no obstructions within | $500 |
| 69. **Room 102**: The towel bar is 55.5-inches above the floor | Remount the towel bar so that it is at most 48-inches above the floor | $150 |
| 70. **Room 102**: The bathroom sink's supply and drain lines are exposed and are not wrapped with insulation | Cover exposed pipes with insulating wrap | $1,500 |
| 71. **Room 102**: The doorknob on the bathroom door is not accessible | Remove existing doorknob and replace with accessible lever type doorknob on both sides of the door | $25 |
| 72. **Room 102**: The doorknob on the closet door is not accessible | Remove existing doorknob and replace with accessible lever type doorknob on both sides of the door | $25 |
| 73. **Room 102**: The closet's hanger bar is 63-inches from the ground and the closet's shelf is 65-inches from the ground | Lower both the hanger bar and the shelf to be no more than 48-inches from the floor | $25 |
| 74. **Room 102**: The iron is mounted at 56-inches above the floor | Remount the iron's holder so that it is no more than 48-inches from the floor | $150 |
| 75. **Room 102**: The clearance width between the bed and the windows is 27-inches | Move the bed so that it abuts another wall in the room so that there can be 30-inches of clear space on either side of the bed | $0 |
| 76. **Room 102**: The thermostat is located 56-inches from the floor | Lower the thermostat so that the operable controls are no higher than 48-inches from the floor | $25 |
| 77. **Room 102**: The room's desk has a knee clearance of 24-inches | Provide a desk with knee clearance of at least 27-inches, a width of 30-inches, and a depth of 19-inches | $150 |
| 78. **Room 102**: The room's lamp is not accessible as a char obstructs the required clear floor space. Also, the lamp's controls are greater than 48-inches from the floor | Relocate the lamp so that there is floor clearance around the lamp of at least a width of 30-inches and a depth of 48-inches. And provide a lamp that's operable parts are no more than 48-inches from the floor | $25 |

| | | |
|---|---|---|
| 79. **Room 102**: The lower peephole on the room's door is located 52.5-inches from the floor | Provide a lower peephole at 43-inches from the floor | $50 |
| 80. **Overall Accessible Room Disbursement**: Of the hotel's 46 rooms, only on (1) room has accessible mobility features | Modify the non-compliant features in the handicap accessible room (Room 102), and provide an additional handicap accessible room that has a bathtub and that is in compliance with the ADA | $5,000 |
| 81. **Overall Accessible Room Disbursement**: Of the hotel's 46 rooms, there are no rooms that have communication features for hearing impaired individuals | Provide four (4) rooms that communication features; at least one of the rooms must be mobility accessible | $2,500 |
| 82. **Overall Accessible Room Disbursement**: Of the hotel's 46 rooms, there no rooms that are both mobility accessible and have communication features | Provide at least one (1) room that has communication features and is mobility accessible | N/A |
| 83. **Overall Accessible Room Disbursement**: Of the hotel's 46 rooms, there is only one (1) room that has accessible mobility features | Disperse the mobility accessible guest rooms among the various classes of sleeping accommodations that are available to guests **without** disabilities. | N/A |
| 84.[3] **Findings without an Area Description**: Certain, unspecified, doorknobs are not handicap accessible | "N/A" | $25 |
| 85. **Findings without an Area Description**: The maneuvering space on the pull side of a certain unspecified interior door extends beyond the latch side of the door | "N/A" | $25 |

(*See generally* Mortland Report; Estimates Report [ECF No. 19-9]). Mortland submits that, in total, the proposed modifications would cost $68,475. (Estimates Report at 6).

---

[3] In both Findings 84 and 85, Mortland does not specifically state where these violations are in the Quality Inn. (*See* Mortland Report at 112–14). Further, Mortland's Recommendation for both these findings are "N/A." (*Id.* at 112, 113).

## C. Defendant's Financial Resources

Plaintiff has attached four years' worth of Defendant's federal tax returns to his Memorandum in Support for his Motion for Summary Judgment. (*See* 2014 Def. Tax Return [ECF No. 19-10]; 2015 Def. Tax Return [ECF No. 19-11]; 2016 Def. Tax Return [ECF No. 19-12]; 2017 Def. Tax Return [ECF No. 19-13]). Plaintiff submits that the tax returns demonstrate that the Defendant "has made hundreds of thousands of dollars of net income." (Pl. Br. in Supp. at 18). Defendant's 2014 Tax Return shows that its net rental estate income was $118,407 for tax year 2014. (2014 Def. Tax Return at p. 7, line 21). In tax year 2015, Defendant's net rental income was $99,701. (2015 Def. Tax Return at p. 7, line 21). Defendant's ordinary business income for tax year 2016 was $198,364. (2016 Def. Tax Return at p. 1, line 21). And in tax year 2017, Defendant's ordinary business income was $73,200. (2017 Def. Tax Return at p. 1, line 21; *see also* Kumar Aff. ¶ 8 [ECF No. 26-1, Ex. B]).[4]

Defendant submits that the Quality Inn has no employees apart from Naresh Kumar ("Mr. Kumar"), the managing member of Defendant; Mr. Kumar's wife, Ms. Kumari; and one of the couple's sons. (Kumar Aff. ¶¶ 2, 7–8). And that there are no more employees as Defendant cannot afford to pay employees. (*Id.* ¶ 7). And while Mr. Kumar agrees that Quality Inn's ordinary business income for tax year 2017 was $73,200, he submits:

> This amount was paid to me, my wife, and son. We covered all three shifts at [the] front desk, my wife and I did most of the house keeping and maintenance as well. In other words, for working more than a total of 8,760 hours (24 hours a day, 7 days a week, and 365 days a year), the three of us received a total of $73,200, which is barely minimum wage. There was no money left over.

(*Id.* ¶ 8). Further, Mr. Kumar states that, when the hotel was purchased it was valued at $1,950,000,

---

[4] Defendant has also attached its tax return for tax year 2017 to its Response to the motion for summary judgment. (*See* ECF No. 26-1 at PAGEID 337–340).

but that it has decreased in value and is presently worth only $1,303,400. (*Id.* ¶ 6). Mr. Kumar submits that Defendant has mortgages totaling over $4,000,000, which makes the hotel difficult to sell as the property is worth approximately $1,303,400. (*Id.* ¶ 10). Finally, Mr. Kumar asserts:

> Divya Jyoti has outstanding tax liabilities to the IRS of approximately $45,000, outstanding real estate taxes in excess of $110,000, and outstanding unpaid franchise fees of $24,000.

> The hotel business does not have any funds to remove the alleged "architectural barriers" as alleged in Plaintiff's complaint.

(*Id.* ¶¶ 11–12).

### D.    Procedural History

Aforementioned, Plaintiff filed suit on August 27, 2018, alleging Defendant violated Title III of the ADA. (*See generally* Compl.). Plaintiff filed a Motion for Summary Judgment on April 9, 2019, asserting that judgment as a matter of law in his favor is proper as there remains no genuine issue of material fact. (*See generally* Pl. Mot. for Summ. J. [ECF No. 18]; *see also* Pl. Br. in Supp. [ECF No. 19]). Defendant opposes summary judgment, asserting: 1) Plaintiff lacks standing; and 2) there is a genuine issue of material fact as to at least one essential element of Plaintiff's claim. (*See generally* Def. Opp'n [ECF No. 26]). Plaintiff's Motion for Summary Judgment is now ripe for review.

## II.

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the movant has the burden of showing that no genuine issue of material fact exists, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

There is a genuine issue of material facts if the non-moving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). Put differently, there is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also Zenith*, 475 U.S. at 587 (concluding that summary judgment is proper when the evidence could not lead the trier of fact to find for the non-moving party).

### III.

Plaintiff's sole cause of action in the case at bar alleges that Defendant violated Title III of the ADA. The ADA was enacted "to remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001). The relevant section of the ADA provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

Plaintiff submits that there remains no genuine issue of material fact as to his claim that Defendant violated Title III of the ADA and, as such, summary judgment in favor of Plaintiff is proper. (*See generally* Pl. Br. in Supp.). Defendant disagrees for three general reasons. First, Defendants submits that Plaintiff lacks the requisite standing to bring the present action.[5] (Def.

---

[5] More accurately, Defendant avers that there remains a genuine issue of material fact as to whether Plaintiff has established standing. (Def. Opp'n at 7) ("There are several genuine issues of material fact as to the assertions in Plaintiff's affidavit."). However, standing is a legal determination, not a factual determination. *See, e.g., Fieger v. Mich. Sup. Ct.*, 553 F.3d 955, 961 (6th Cir. 2009) (citing *United Steelworkers of Am. v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 277 (6th Cir. 2007)).

Opp'n at 5–9). Second, Defendant challenges whether Plaintiff's expert, Mortland, is qualified under Rule 702. (*See id.* at 11–12). And third, Defendant avers that reasonable jurors could disagree as to whether Plaintiff has established all elements of his case. (*Id.* at 10–15). The Court will address each argument in turn.

## A.    Standing

Under Article III of the United States Constitution, federal courts are permitted to hear only actual cases and controversies. *See* U.S. Const. art. III, § 2; *see also Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017). "Standing is a threshold inquiry in every federal case and it involves an inquiry into whether 'a plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction to justify exercise of the court's remedial powers on his behalf.'" *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 332 (6th Cir. 2002) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Thus, "[w]hether a plaintiff has standing to sue is 'determined as of the time the complaint is filed.'" *Sullivan v. Benningfield*, 920 F.3d 401, 407 (6th Cir. 2019) (quoting *Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 524 (6th Cir. 2001)). However, each element of standing "must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Therefore, "to support standing at the summary judgment stage a plaintiff must only 'set forth by affidavit or other evidence specific facts [sufficient to establish standing,] which for the purposes of summary judgment motion will be taken as true.'" *Am. Civil Liberties Union of Ohio Found., Inc. v. DeWeese*, 633 F.3d 424, 430 n.2 (6th Cir. 2011) (quoting *Lujan*, 504 U.S. at 561).

"To establish standing under Article III, a plaintiff must show '(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likel[ihood] that the injury will be redressed by a favorable decision.'" *Sullivan*, 920 F.3d at 407

(quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014)) (change in original); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). These three requirements are the "irreducible minimum required by the Constitution." *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 664 (1993) (internal quotations omitted).

Additionally, "'[i]n the context of claims for injunctive or declaratory relief,' the threatened injury in fact must be 'concrete and particularized,' as well as 'actual and imminent, not conjectural or hypothetical[.]'" *Sullivan*, 920 F.3d at 407–08 (quoting *Sumpter v. Wayne Cty.*, 868 F.3d 473, 491 (6th Cir. 2017)). In ADA cases, a plaintiff must show a "threat of future injury" by demonstrating an "intent to return to the noncompliant accommodation" or "that he would return, but is deterred from visiting the noncompliant accommodation because of the alleged accessibility barriers." *Gaylord v. Hamilton Crossing CMBS*, 582 F. App'x 576, 580 (6th Cir. 2014).

Whether an individual has Article III standing is a question of law to be decided by the Court, not the finder of fact. *See e.g., Fieger v. Mich. Sup. Ct.*, 553 F.3d 955, 961 (6th Cir. 2009) (citing *United Steelworkers of Am. v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 277 (6th Cir. 2007)) ("Whether a party has standing is a question of law that we review de novo.").

The parties appear to dispute only the first prong of the standing analysis. (*See* Def. Opp'n at 6–9).[6] As such, the Court will focus solely on whether Plaintiff has sufficiently established that he suffered an injury in fact.

Under Title III of the ADA, a private citizen can only seek injunctive relief. *See* 42 U.S.C.

---

[6] "Specifically, [Defendant] contends that Plaintiff lacks standing because contrary to his representations in the affidavit, Plaintiff never stayed at the subject hotel and, therefore, was without sufficient information and basis to make assertions in his affidavit about the alleged architectural barrier, and there is no evidence that he intends to return to the subject hotel." (Def. Opp'n at 5).

§ 12188(a)(2). Thus, "[i]n order to demonstrate [the first] element, an individual who . . . seeks only injunctive relief, must 'show that he is under threat of suffering [an] injury in fact.'" *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579 (6th Cir. 2014) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). Further, "[t]he 'threat' of a prospective injury must be real and immediate and not premised upon the existence of past injuries alone." *Id.* (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983); *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

Plaintiffs avers:

Plaintiff has previously visited Defendant's property. Plaintiff pled and states that he has planned and still plans to return to stay as a guest at Defendant's property on his return to the Dublin area if the Defendant's hotel is made fully accessible to a disabled person in a wheelchair. . . . Plaintiff has standing to seek injunctive relief against Defendant; Plaintiff has provided a specific plan or timeframe on when he will return if proper remediations are made. A disabled patron, who has been previously denied access to a public accommodation, need not be required to plan and schedule a return trip when that person knows remediations have not been made and that he will be discriminated again. The potential of real harm continues until the property remedies these problems consistent with the law.

Once Plaintiff visited the property and was subjected to the discrimination there, he suffered a concrete and particularized injury that is actual and imminent until the property is ADA compliant. It would be an exercise in futility for Plaintiff to regularly visit the property only to be continually subjected to the harm in order to "realize" the injury sufficient for standing. Additionally, it would be a waste of judicial economy to require an ADA plaintiff to provide a declaration to indicate only that he or she wishes to visit the property in the future when that same plaintiff was already subjected to discrimination during a previous visit. If a plaintiff visits a property once and is subjected to discrimination in violation of the ADA, a Court can conclude that the disabled individual may visit the property again without filing the legal formality indicating that but for the architectural barriers, the disabled plaintiff will return to the property.

(Pl. Br. in Supp. at 10–11).

Defendants submits:

Plaintiff lacks standing to sue for injunctive relief because he did not suffer injury, nor was he going to continue to suffer an injury within the meaning of Title III of

the ADA. Plaintiff did not stay at the subject hotel, and as a result, he did not suffer injury in a personal or individual way as is required to have standing.

* * *

Additionally, Plaintiff lacks standing here because, he has brought at least thirty (30) other lawsuits against hotels and other such establishments in Ohio, professing that he intends to return in the future to all these hotels and other facilities to avail himself of their respective services. It should also be noted that Plaintiff's expert, Derek Mortland, has himself been a plaintiff in approximately forty (40) ADA related cases.

(Def. Opp'n at 8). A review of the evidence submitted to the Court reflects that Plaintiff has

sufficiently established that he has standing at this point in the litigation.

Plaintiff's Complaint asserts:

Mr. Neal plans to return to stay as a guest at Defendant's property on his next scheduled trip to the area in September 2018, if the Defendant's Hotel is made fully accessible to a disabled person in a wheelchair, and to avail himself of the Hotel and its services. The Plaintiff has personally encountered architectural barriers at the subject property, which barriers are enumerated herein. The barriers to access at the property have denied him the full and equal access to the property.

(Compl. ¶ 5). Additionally, Plaintiff submitted an affidavit attached to his Memorandum in

Support of the Motion for Summary Judgment, in which Plaintiff swears:

I have a definite plan to return to the Quality Inn & Suites; I would like to visit the property to avail myself of the services available at the property and also to assure myself that this property in compliance with the ADA so that myself and other similarly situated will have full and equal enjoyment of the property without fear of discrimination. I had plans to return to stay at the hotel, but I am unable to visit because the property remains non-compliant. I would like to return but for its non-compliance.

(Neal Aff. 1 ¶ 5).

As stated *supra*, "to support standing at the summary judgment stage a plaintiff must only

'set forth by affidavit or other evidence specific facts'" that would sufficiently establish standing.

*DeWeese*, 633 F.3d at 430 n.2 (quoting *Lujan*, 504 U.S. at 561). Accordingly, Plaintiff's affidavit

submitted contemporaneously with his Memorandum in Support of Summary Judgment

sufficiently demonstrates standing. While, Plaintiff does not specify exactly when he plans to return to the Quality Inn, such lack of specificity does not quash Plaintiff's standing to bring suit. Plaintiff's statement that he plans to return to the Quality Inn once the hotel modifies its alleged noncompliant features[7] is sufficiently specific, at this stage, to support standing. *See Neal v. Second Sole of Youngstown, Inc.*, No. 1:17-cv-1625, 2018 WL 1740140, at *7 (N.D. Ohio Apr. 11, 2018) (citing *Houston v. Marod Supermarkets*, 733 F.3d 1323, 1340 (11th Cir. 2013)).

Defendant posits that "[t]here is no way [Plaintiff] could have observed the barriers he is alleging, including interior barriers, barriers in the guest room, barriers in the room's toilet and lavatory[,]" because he did not stay overnight at the Quality Inn. (*See* Def. Opp'n at 6–7). First, to determine standing at the summary judgment stage, the Court takes a plaintiff's affidavit as true. *See DeWeese*, 633 F3d at 430 n.2. Plaintiff has submitted an affidavit in which he has sworn: 1) he received a guest room at the Quality Inn; 2) he stayed overnight at the Quality Inn, for as long as he practicably could; and 3) during his stay at the Quality Inn, he encountered/observed several architectural barriers. (*See* Neal Aff. 1 ¶ 4; Neal Aff. 2 ¶¶ 3–5). And while Defendant disputes that Plaintiff received a guest room and that he stayed overnight at the hotel, the Court does not weigh an individual's credibility at this stage in the proceedings. Thus, for the limited purpose of establishing standing at summary judgment, the Court takes Plaintiff's sworn statements as true and finds Defendant's argument unconvincing.

Next, Defendant asserts that: "based upon [Plaintiff's] misrepresentations in the affidavit, there is no evidence that he intends to return to the hotel, and as such, his injury is not 'real and immediate' but is conjectural and hypothetical[,]" (Def. Opp'n at 7), and that Plaintiff does not

---

[7] "I have a definite plan to return to the Quality Inn & Suites; I would like to visit the property to avail myself of the services available at the property and also to assure myself that this property is in compliance with the ADA . . . ." (Neal Aff. 1 ¶ 5)

have standing because "he has brought at least thirty (30) other lawsuits against hotels and other such establishments in Ohio, professing that he intends to return to all of these hotels and other facilities to avail himself of their respective services[,]" (*id.* at 8). The Court finds this argument unpersuasive. As stated above, at the summary judgment stage, it is not the role of the Court to weigh the credibility of witnesses.

Thus, for these reasons, the Court finds that Plaintiff has sufficiently established standing at the summary judgment stage of this case.

**B.    *Daubert***

Attached to Plaintiff's Memorandum in Support of his Motion for Summary Judgment, Plaintiff submitted Derek Mortland's: expert report, (*see* Mortland Report); curriculum vitae, (*see* Mortland CV [ECF No. 19-7]); April 9, 2019 Affidavit, (Mortland Aff. [ECF No. 19-5]); estimate report of proposed modifications, (*see* Estimates Report); and compensation invoice, (*see* Mortland Invoice [ECF No. 19-8]). Defendant avers Mortland's Report lacks foundation as to his qualifications to render him an expert on matters "relating to the review and analysis of a business entity's tax returns or investigating its financial background or wherewithal." (Def. Opp'n at 11, 12). Thus, Defendant seeks to exclude Mortland's findings as to the legal conclusion that the proposed modifications are "readily achievable" as a matter of law and the portions of his opinions related to the Defendant's financial wherewithal.[8]

Federal Rules of Evidence 702 and 104(a) govern the admissibility of an expert's opinion and report. *See Daubert v. Merrell Dow Pharm*, 509 U.S. 579, 589 (1993). Under Rule 702, a witness is "qualified as an expert by knowledge, skill, experience, training, or education," which

---

[8] Though Defendant did not submit this challenge in a Motion to Exclude, the Court considers this portion of Defendant's Response in Opposition to Summary Judgment as such motion.

is established by "(a) the expert's scientific, technical or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Further, the expert's opinion must be relevant, meaning the "expert testimony must 'fit' with the issues to be resolved at trial." *Reber v. Lab. Corp. of Am.*, No. 2:14-cv-2694, 2017 WL 3888351, at *4 (S.D. Ohio Sept. 6, 2017) (quoting *Greenwell v. Boatwright*, 184 F.3d 492, 496 (6th Cir. 1999)).

The Supreme Court mandates that a district court exercise its responsibility in acting as the "gatekeeper" for expert testimony. *Daubert*, 509 U.S. at 588; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). This role, however, is not intended to supplant the adversary system or the role of the jury. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 531–32 (6th Cir. 2008). Arguments regarding the weight to be given to an expert witness's testimony or opinions are properly left to the jury. *Id.* "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596).

"The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529–30.

To determine whether expert testimony is "reliable," the Court's role, and the offering party's responsibility, "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*

*Tire Co.*, 526 U.S. at 152. Generally, the expert's opinion must reflect "scientific knowledge . . . derived by the scientific method," representing "good science." *Daubert*, 509 U.S. at 590, 593. The test of reliability is, however, a "flexible" one." *Kumho Tire Co.*, 526 U.S. at 140.

Any doubts regarding the admissibility of an expert's testimony should be resolved in favor of admissibility. Fed. R. Evid. 702 Advisory Committee's Notes ("[A] review of the case law . . . shows that rejection of the expert testimony is the exception rather than the rule."); *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000) (stating that in *Daubert* "[t]he Court explained that Rule 702 displays a liberal thrust when the general approach of relaxing the traditional barriers to opinion testimony") (internal quotations omitted).

Attached to Plaintiff's Memorandum in Support for his Motion for Summary Judgment is Defendant does not appear to dispute that Mortland is qualified to render an opinion as to: 1) the nature of the alleged violations; 2) the proposed remedy to such violations; and 3) the cost of remedying such violations.[9] (*See* Def. Opp'n at 10–15). Rather, Defendant appears to challenge whether Mortland is qualified to opine as to whether modification or removal of the barrier are

---

[9] In his Reply, Plaintiff appears to conflate Defendant's challenge to Mortland's qualifications to opine on whether barrier removal is readily achievable as a challenge to Mortland's qualifications to render an opinion on the estimating the cost of remedying the identified barriers. (*See* Pl. Reply at 4–8). Plaintiff relies on Defendant's submission: "The [expert] report submitted with [Plaintiff's] motion [for summary judgment] lacks foundation. In addition, Plaintiff is not a qualified expert to determine the cost of construction and barrier removal." (*See* Pl. Reply at 4; Def. Opp'n at 11). Relying on such statements, Plaintiff asserts that Mortland's credentials qualify him as an expert on estimating the cost of barrier removal. (Pl. Reply at 4–6). However, the Court reads Defendant's Opposition and *Daubert* challenge differently. The Court reads this to be challenges to: 1) the foundation of Mortland's Report; and 2) Plaintiff's ability to opine as to the cost of construction and barrier removal; and not a challenge to Mortland's qualifications to opine on the cost of remedying the alleged violations. Further, Plaintiff has not sought to qualify himself as an expert as to the cost of construction and barrier removal. As such the Court need not further examine whether or not he is qualified in this regard.

22

readily achievable. (*See id.* at 11–12).

The Court agrees with Defendant. In his Affidavit, Mortland submits:

> Based upon the inspection of the facility and my review of the Defendant's 2014, 2015, 2016, and 2017 tax returns, it is my opinion that the Defendant's financial means are such that they can perform the modification set forth in my reports over a span of months or years. Additionally, pursuant to the ADA, specifically 28 CFR 36.304, [sic] many of the barriers discovered at the Quality Inn & Suites are *per se* readily achievable, in that they fall under a list of examples specifically designated as readily achievable.

(Mortland Aff. ¶ 4).

First, no witness, even an expert, may testify as to what the law requires and what the law is. *See Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 322 (6th Cir. 2014) (stating "a witness may not testify to a legal conclusion."); *see also Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 593 (6th Cir. 2014). And while an expert's "opinion is not objectionable just because it embraces an ultimate issue[,]" Fed. R. Evid. 704, it is the Court's role and responsibility to inform the jury of the law and what the law defines "readily achievable" to mean. As such, the portions of Mortland's reports and testimony as to whether the proposed modifications are readily achievable are excluded and Mortland shall not testify to these matters at trial.

Second, a review of Mortland's CV demonstrates that he lacks experience in taxation, accounting, or business finance. Thus, Plaintiff has failed to meet his burden to demonstrate that Mortland is qualified to provide an opinion as to whether a business entity can afford to make the proposed modifications based on his review of four years of the business's tax returns. Plaintiff's submission that: "Plaintiff need not retain some renowned financial or economics expert to represent that which [Defendant's] tax documentation show already[,]" (Pl. Reply at 7) is not well taken. Simply put, taxes are complex and concluding that a business can afford to make $68,475 worth of repairs simply by reviewing four years of the business's tax returns is outside the scope

of either a layperson's knowledge or Mortland's expertise. Accordingly, the portions of Mortland's report and testimony that opine as to whether Defendant is financially able to make the proposed modifications are excluded. Mortland is also barred from testifying on such matters at trial.

## C.    ADA Violation

The ADA requires places of public accommodation "to remove architectural barriers that are structural in nature, in existing facilities . . . where such removal is readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv). Thus, in order to establish a Title III claim under the ADA, a plaintiff must establish: "(1) he or she is disabled within the meaning of the ADA; (2) the defendant[] own[s], lease[s], or operate[s]  a place of public accommodation; and (3) the defendant[] discriminated against the plaintiff within the meaning of the ADA." *Young v. Kali Hosp, LTD.*, No. 2:07-cv-395, 2010 WL 3037017, at *4 (S.D. Ohio Aug. 2, 2010). "[D]iscrimination includes . . . failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv).

Plaintiff submits that there remains no genuine issue of material fact as to any of the elements of his ADA claim. Defendant does not appear to dispute that it owns and operates a "public accommodation." (*See* Def. Opp'n at 10–15). However, Defendant appears to, albeit tentatively, dispute whether Plaintiff is disabled. (*See id.* at 1). And Defendant spends the bulk of its brief asserting that there is a genuine issue of material fact as to whether the modifications that Plaintiff proposed are readily achievable. (*See id.* at 10–15). The Court will discuss each argument

in turn.

### 1.    Plaintiff's Disability

The ADA defines "disability" to mean:

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1). Walking and standing are major life activities. *See* 42 U.S.C. § 12102(2)(A).[10] Plaintiff asserts that there is no genuine issue of material fact that he is disabled within the meaning of the ADA as he is "a wheelchair bound disabled person." (Neal Aff. 1 ¶ 1; *see also* Pl. Br. in Supp. at 1; Pl. Reply at 1). And while Defendant seems to tentatively dispute Plaintiff's disability, (Def. Opp'n at 1),[11] it has cited to no facts in the record to sufficiently dispute Plaintiff's sworn testimony that he is confined to a wheelchair. Accordingly, Plaintiff has sufficiently established that he is disabled within the meaning of the ADA.

### 2.    Readily Achievable

Plaintiff asserts summary judgment is proper as he has demonstrated that the modifications he proposed are "readily achievable." (Pl. Br. in Supp. at 16–18; Pl. Reply at 6–8).

Under the ADA, "discrimination" includes:

(iv) a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities, and transportation barriers in existing vehicles and rail passenger cars used by an establishment for transporting individuals (not including barriers that can only be removed through the retrofitting

---

[10] "For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."

[11] "Plaintiff *alleges* to be a disabled Ohio resident who qualifies as an individual with disabilities as defined by the American[s] with Disabilities Act . . . ." (Def. Opp'n at 1) (emphasis added).

of vehicles or rail passenger cars by the installation of a hydraulic or other lift), where such removal is readily achievable; and

(v) where an entity can demonstrate that the removal of a barrier under clause (iv) is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable.

42 U.S.C. §§ 12182(b)(2)(A)(iv)–(v). The ADA defines "readily achievable" to mean "easily accomplishable and able to be carried out without much difficult or expense." 42 U.S.C. § 12181(9). Factors a court is to consider when determining whether modifications are "readily achievable" include:

(A) the nature and cost of the action needed under this chapter;

(B) the overall financial resources of the facility or facilities involved in the action; the number of persons employed at such facility; the effect on expenses and resources; or the impact otherwise of such action upon the operation of the facility;

(C) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(D) the type of operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C. § 12181(9). However, the precise question as to which party bears the burden of establishing that modifications are "readily achievable," is one that the Sixth Circuit has not yet answered. And while the Second, Eighth, Ninth, Tenth, and Eleventh Circuits have explicitly addressed this issue, these circuits are not in agreement as to the appropriate test.

In *Johnson v. Gambrinus Co./Spoetzl Brewery*, to determine whether a modification would be readily achievable, the Fifth Circuit adopted a burden shifting test. 116 F.3d 1052 (5th Cir. 1997). The Fifth Circuit held: "the plaintiff bears the burden of showing a that a modification was

requested and that the requested modification was reasonable." *Id.* at 1059. Then, "the defendant must make the requested accommodation unless the defendant pleads and meets its burden of proving that the requested accommodation would fundamentally alter the nature of the public accommodation." *Id.*

The Tenth Circuit, in *Colo. Cross Disability Coal. v. Hermanson Family Ltd. P'ship I*, 264 F.3d 999 (10th Cir. 2001), also adopted a burden shifting test, however a different test than the Fifth Circuit's. In *Colo. Cross*, the Tenth Circuit held that the "[p]laintiff bears the initial burden of production to present evidence that a suggested method of barrier removal is readily achievable [and] can be accomplished easily and without much difficult or expense." *Id.* at 1005–06. If the plaintiff meets this burden, then the defendant has "the opportunity to rebut that showing" and to "[bear] the ultimate burden of persuasion regarding its affirmative defense that a suggested method of barrier removal is not readily achievable." *Id.* at 1006.

In *Colo. Cross*, the plaintiff sought to have the defendant install an accessible ramp at the entrance of a historic building. *Id.* at 1007. During a bench trial, the plaintiff relied upon expert testimony that the "front entrance . . . could be made accessible without threatening or destroying the historic significance of the building." *Id.* And plaintiff's financial expert testified that "the financial impacts of installing ramps would be relatively immaterial and easily achievable." *Id.* at 1008. Yet the *Colo. Cross* Court found that plaintiff failed to meet his burden of production because he provided only "speculative concepts" without "precise cost estimates regarding the proposed modification." *Id.* at 1009.

In *Gathright-Dietrict v. Atlanta Landmarks, Inc.*, the Eleventh Circuit adopted the *Colo. Cross* test. *See* 452 F.3d 1269, 1274 (11th Cir. 2006) ("[W]e adopt that burden shifting framework for the reasons articulated by the *Colorado Cross* court."). The Eleventh Circuit stated that "a

plaintiff must present evidence so that a defendant can evaluate the proposed solution to a barrier, the difficult of accomplishing it, the cost [of] implementation, and the economic operation of the facility." *Id.* As "[w]ithout evidence on these issues, a defendant cannot determine if it can meet its subsequent burden of persuasion." *Id.*

In *Gathright-Dietrich*, the plaintiffs sought to have the defendants modify an historic theater. *Id.* at 1271–72. However, the Eleventh Circuit upheld the district court's grant of summary judgment in favor of defendants as plaintiffs provided "non-specific, conceptual proposals that did not provide any detailed cost analysis." *Id.* at 1274. Because plaintiff failed to provide expert testimony on the feasibility of the proposed modifications, failed to demonstrate that the proposed modifications were inexpensive, and failed to "produce a financial expert to link the estimated costs of [the] proposals with [the defendant's] ability to pay for them[,]" summary judgment was proper. *Id.* at 1274–75.

However, when deciding whether modifications to an historic building were readily achievable, the Ninth Circuit expressly rejected the Tenth Circuit's burden shifting approach. *See Molski v. Foley Estates Vineyard & Winery, LLC*, 531 F.3d 1043, 1048 (9th Cir. 2008) ("[W]e place the burden on the party with the best access to information regarding the historical significance of the building."). The *Molski* Court held that a defendant "is in a better position to introduce, as part of an affirmative defense, detailed evidence and expert testimony concerning whether the historic significance of a structure would be threatened or destroyed by the proposed barrier removal plan." *Id.*

The Second Circuit has also adopted a burden shifting test. *See Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 372 (2d Cir. 2008). However, the Second Circuit's test differs from the one enunciated by the *Colo. Cross* Court. Under the Second Circuit's test, the plaintiff must establish

"that the area in question is covered by the statute and that the desired access may be achieved with a cost and scope not disproportionate to the overall alteration[,]" to meet the burden of production. *Id.* Thus, a plaintiff meets his burden by providing "cost estimates that are facially plausible, without reference to design details, and are such that the defendant can assess its feasibility and cost." *Id.* The *Roberts* Court further specified that "[n]either the estimate nor the proposal are required to be exact or detailed." *Id.* at 373. If a plaintiff provides such estimates, the burden then shifts to the defendant to demonstrate that "the cost and scope of compliance would, in fact, be disproportionate." *Id.*

Here, Plaintiff appears to rely upon the Ninth Circuit's test. (*See* Pl. Br. in Supp. at 16–17) (citing *Molski*, 481 F.3d at 730). And relying on this precedent, Plaintiff avers that 28 C.F.R. § 36.304[12] "provides 21 examples of barrier removal which are considered *per se* readily

---

[12] The subsection that Plaintiff refers to lists 21 examples of steps that an owner of a public accommodation can take to remove barriers, the examples listed are:
   (1) Installing ramps;
   (2) Making curb cuts in sidewalks and entrances;
   (3) Repositioning shelves;
   (4) Rearranging tables, chairs, vending machines, display racks, and other furniture;
   (5) Repositioning telephones;
   (6) Adding raised markings on elevator control buttons;
   (7) Installing flashing alarm lights;
   (8) Widening doors;
   (9) Installing offset hinges to widen doorways;
   (10) Eliminating a turnstile or providing an alternative accessible path;
   (11) Installing accessible door hardware;
   (12) Installing grab bars in toilet stalls;
   (13) Rearranging toilet partitions to increase maneuvering space;
   (14) Insulating lavatory pipes under sinks to prevent burns;
   (15) Installing a raised toilet seat;
   (16) Installing a full-length bathroom mirror;
   (17) Repositioning the paper towel dispenser in a bathroom;
   (18) Creating designated accessible parking spaces;
   (19) Installing an accessible paper cup dispenser at an existing inaccessible water fountain;

achievable." (Pl. Br. in Supp. at 16) (citing *Johnson v. Dhami*, No. 2:14-cv-1150, 2014 WL 4368665 (E.D. Cal. Sept. 2, 2014); *Johnson v. Hall*, No. 2:11-cv-2817, 2012 WL 1604715 (E.D. Cal. May 7, 2012)).[13] In contrast, Defendant appears to advocate that the Court adopt the Tenth Circuit's burden shifting test. (*See* Def. Opp'n at 10); *see also Disabled Patriots of Am., Inc. v. Odco Invs., Ltd.*, No. 3:04-cv-7399, 2006 WL 782725, at *4 (N.D. Ohio Mar. 27, 2006) (citing *Colo. Cross*, 264 F.3d at 1009)).

As noted by this Court in *Young v. Kali Hosp., LTD.*, No. 2:07-cv-395, 2010 WL 3037017, at *8 (S.D. Ohio Aug. 2, 2010), while the Sixth Circuit has yet to adopt a test, district courts within the Sixth Circuit have regularly followed the Tenth Circuit's *Colorado Cross* test. *See Access 4 All, Inc. v. OM Mgmt., LLC*, No. 2:06-cv-374, 2007 WL 1455991, at *10–11 (S.D. Ohio May 15, 2007) (finding that factual questions precluded summary judgment in plaintiff's favor); *Disabled Patriots of Am., Inc. v. ODCO Invs., Ltd.*, No. 3:04-cv-7399, 2006 WL 782725, at *4 (N.D. Ohio Mar. 27, 2006) (denying summary judgment in favor of plaintiffs as they failed to provide "a complete and precise cost to remove all barriers"). The *Young* Court ultimately declined to adopt a test, as it found that plaintiff's claim failed under both the Second Circuit's test, that plaintiff proposed the Court adopt, as well as the Tenth Circuit's test, which the Defendant requested the Court adopt. *Id.* at *8. However, in *dicta*, the *Young* Court noted that if found "the reasoning in *Colorado Cross* persuasive." *Id.* at *8 n.7. And this Court agrees, the Tenth Circuit's burden

---

(20)    Removing high pile, low density carpeting; or

(21)    Installing vehicle hand controls.

28 C.F.R. § 36.304(b).

[13] The Court notes that it is slightly unclear which test Defendant proposes that the Court adopt. In his Memorandum in Support of his Motion for Summary Judgment, Defendant appears to rely on the Ninth Circuit's test. (*See* Pl. Br. in Supp. at 16–17). However, in his Reply, Plaintiff, at times, appears to rely on the *Colorado Cross* burden shifting test. (*See* Pl. Reply at 7–8).

shifting test enunciated in *Colorado Cross* is the appropriate test.

Thus, the plaintiff has the initial burden of proof to put forth "precise cost estimates regarding the proposed modification[s.]" *Colo. Cross*, 264 F.3d at 1009. If the plaintiff has met this initial burden, the burden then shifts to the defendant to rebut plaintiff's showing. *Colo. Cross*, 264 F.3d at 1008.

Implementing the Tenth Circuit's test, the Court cannot determine, as a matter of law, that no reasonable jury could find for the Defendant. First, the Court notes that the Court's sister district court has stated that "[d]etermining 'whether a specific change is readily achievable is a fact intensive inquiry that will rarely be decided on summary judgment.'" *Disabled Patriots of Am.*, 2006 WL 782725, at *4 (quoting *D'Lil v. Stardust Vacation Club*, No. CIV-S-00-1496, 2001 U.S. Dist. LEXIS 23309, at *17 (E.D. Cal. Dec. 20, 2001). Further, the Northern District Court noted "[t]he determination is 'made on a case by case basis under the particular circumstances and factors listed in the definition of readily achievable.'" *Id.* (quoting *Colo. Cross*, 264 F.3d at 1009); *see also* 28 C.F.R. § 36.104. Included in the factors a court must consider are the nature and cost of removing the barriers and the financial resources of the defendant facility. 42 U.S.C. § 12181(9).

Plaintiff has submitted Mortland's detailed violations' report and his detailed estimates as to the cost of remedying the violations. (*See* Mortland Report; Cost Estimates). This information also adequately alerts Defendant so that it can evaluate the proposed remedies to the violations, the costs associated with remedying the violations, and the economic operation of the Quality Inn. Thus, Plaintiff has satisfied his burden. However, Defendant has proffered that it does not have the financial means to make the proposed modifications either immediately or over the next five years. Defendant asserts that it "does not have any funds to remove the alleged 'architectural

barriers' as alleged in Plaintiff's complaint[,]" as it has: 1) mortgages that exceed $4,000,000; 2) outstanding federal taxes of approximately $45,000, 3) outstanding real estate taxes exceeding $110,000; and 4) unpaid franchise fees of $24,000. (Kumar Aff. ¶¶ 10–12). Whether Defendant's resources are sufficient to remedy the violations is a question of fact that must be submitted to the jury. As such, summary judgment in Plaintiff's favor is improper.

**IV.**

Thus, for the reasons stated herein, Plaintiff's Motion for Summary Judgment (ECF No. 18) is **GRANTED in part and DENIED in part**.

**IT IS SO ORDERED.**

7 - 29 - 2019

DATE

EDMUND A. SARGUS, JR.
CHIEF UNITED STATES DISTRICT JUDGE